UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――

JAWWAD ABDUL-HALIM,

                              Plaintiff,

     v.                                                    9:19-CV-0740
                                                           (MAD/ML)

PETE BRUYERE and DONALD VENETTOZZI,

                              Defendants.

―――――――――――――――――――――――

APPEARANCES:

JAWWAD ABDUL-HALIM
Plaintiff, *pro se*
13-A-3499
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

HON. LETITIA JAMES                    HELENA O. PEDERSON, ESQ.
Attorney General for the              Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224-0341
Attorney for Defendants

**MIROSLAV LOVRIC**
**United States Magistrate Judge**

### REPORT-RECOMMENDATION AND ORDER[1]

     Plaintiff *pro se* Jawwad Abdul-Halim ("Abdul-Halim" or "Plaintiff"), an inmate in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS") at Five Points Correctional Facility ("Five Points C.F."), brings this action

―――――――――――――――――

     [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §
636(b) and N.D.N.Y.L.R. 72.3(c).

pursuant to 42 U.S.C. § 1983 against Defendants for violations of his Fourteenth Amendment rights.  Dkt. No. 1 ("Compl.").  Presently before the Court is Defendants' motion for summary judgment and dismissal of Abdul-Halim's Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Dkt. No. 43.  For the following reasons, it is recommended that Defendants' motion for summary judgment be granted in part and denied in part.

## I. BACKGROUND

### A. Facts[2]

At the time of the incidents described in the Complaint, Abdul-Halim was incarcerated at Gouverneur Correctional Facility ("Gouverneur C.F.").  *See generally* Compl.

On May 30, 2017, Office of Special Investigations ("OSI") Narcotics Investigator Jacob Woodworth ("Woodworth")[3] generated an Inmate Misbehavior Report ("MBR") charging Abdul-Halim with violating the following rules: Rule 113.25 (drug possession); Rule 114.10 (smuggling); Rule 180.10 (facility visiting violation); and Rule 180.11 (facility correspondence violation).  Dkt. No. 55-1 at 16; Dkt. No. 55-3 at 1.[4]  The MBR was written on a Watertown Correctional Facility ("Watertown C.F.") form and indicated that Abdul-Halim was assigned to housing location I-1-22B.  *Id.*

---

[2]  The parties annexed exhibits to their submissions without objection or challenge to the authenticity of the documents.  Therefore, the Court will consider the exhibits in the context of the within motion.  *See U.S. v. Painting known as Hannibal*, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y.  May 18, 2010) (citing *Daniel v. Unum Provident Corp.*, 261 F. App'x 316, 319 (2d Cir.  2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party)).  In light of the procedural posture of the case, the following recitation is derived from the record now before the Court, with all inferences drawn and ambiguities resolved in non-moving party's favor.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[3]  Woodworth is not named as a defendant herein.

[4]  Citations to page numbers refer to the pagination generated by Case Management Electronic Case Filing ("CM/ECF"), not the page numbers generated by the parties.

The MBR stated:

> On [January 30, 2017 at approximately 3:52 PM], a letter was received by the Office of Special Investigations Narcotics Unit. Upon receipt a confidential investigation was initiated. It was determined that Inmate Abdulhalim sent an outgoing letter to David London of [redacted]. This letter contained instructions detailing how he wanted drug/contraband to be smuggled into Elmira Correctional during visitation. Abdulhalim describes how to package and smuggle drugs/contraband into the facility. The contraband described was "Bud," "Dope/Molley," and "K-2." The letter had a return address containing Inmate Juan Alcantara [redacted] information. David London was determined to be a past visitor of Inmate Abdulhalim through investigation. Confidential information was received that indicated Inmate Abdulhalim had in fact sent this outgoing letter using Inmate Alcantara's name and DIN.

Dkt. No. 55-1 at 16. On May 30, 2017, Abdul-Halim was transferred to Gouverneur C.F.[5]

Dkt. No. 43-4 at 94. On June 6, 2017, Abdul-Halim received a copy of the MBR. *Id*. at 26.

Defendant Pete Bruyere ("Bruyere") was assigned as the hearing officer for Abdul-Halim's Tier III disciplinary hearing related to the MBR.[6] Dkt. No. 55-1 at p. 2, ¶ 7. Prior to the hearing, Abdul-Halim selected a hearing assistant, M. Foster ("Foster"), to help prepare his defense. Dkt. No. 43-4 at 28-29. On June 8, 2017, Abdul-Halim met with Foster and requested that Juan Alcantara and Woodworth appear as witnesses at the hearing. Dkt. No. 55-1 at 63-65. Abdul-Halim also asked for various documents including: (1) portions of the Facility Operating Manual ("FOM") pertaining to the rules, delivery, and chain of custody of misbehavior reports; (2) Chapters 5 and 6 of "Title 7;" (3) a redacted copy of confidential investigation protocols and procedures; (4) a copy of the Unusual Incident Report and "chain

---

[5] Plaintiff testified that he was transferred because he was re-classified from "maximum to minimum." Dkt. No. 43-4 at 28.

[6] At the relevant time, Bruyere was the Food Service Administrator II ("FSA II") at Gouverneur C.F. Dkt. No. 55-1 at p. 1, ¶ 1.

of custody; and (5) a copy of the case entitled *Wolff v. McDonald*. *Id*. at 65. Foster advised Abdul-Halim that the FOM and Unusual Incident Report did not exist and requested copies of the relevant portions of Title 7. *Id.* For security reasons, Foster could not provide copies of confidential investigation protocols and procedures. *Id*. Foster suggested that Abdul-Halim obtain the requested caselaw from the law library. Dkt. No. 55-1 at 63-65.

On June 12, 2017, the disciplinary hearing commenced. Dkt. No. 55-1 at 57. Bruyere advised Abdul-Halim of his rights and obligations, including his right to call witnesses, present oral or documentary evidence, and raise objections. *Id*. at 76-77. Abdul-Halim advised Bruyere that he requested "several other articles" from his assistant that were "denied." *Id*. Bruyere read the MBR into the record. Dkt. No. 55-1 at 77-78, 80.

Bruyere advised Abdul-Halim that the hearing would be adjourned to take confidential testimony from Woodworth outside of Abdul-Halim's presence. Prior to adjourning, Bruyere asked Abdul-Halim if he had any questions for the investigator. Dkt. No. 55-1 at 81. Abdul-Halim provided Bruyere with questions for Woodworth and asked Bruyere to request documentation from Woodworth including copies of the London letter and the confidential informant's statement. *Id*. at 81-83. Abdul-Halim also asked for "any mail watch authorizations [. . .] for [. . .] Abdulhalim or for Mr. Juan Alcantara." *Id*. at 82.

During the confidential portion of the hearing, Woodworth testified about his investigation into the London letter. Dkt. No. 55-3 at 4, ¶17. Woodworth disclosed the identity of the confidential informant to Bruyere and discussed his interview with the informant, his review of facility visitation logs, and his investigative techniques. *Id.* Relying upon that information, Woodworth concluded that Abdul-Halim wrote the London letter. *Id*.

When the non-confidential portion of the hearing resumed, Bruyere asked Woodworth to explain his conclusions. Dkt. No. 55-1 at p, 7, ¶ 32. Woodworth testified that the London letter prompted an OSI investigation. *Id*. Woodworth also stated that he was "very confident that the confidential informant's information was accurate" and "could be used and trusted." *Id*. at 85. Abdul-Halim posed questions to Woodworth and Bruyere provided a copy of the London letter for Abdul-Halim to review. Dkt. No. 55-1 at 85-89, 94-95.

After a brief adjournment, the hearing resumed and Alcantara was called to testify. Dkt. No. 55-1 at 90-92. In response to questioning by Abdul-Halim, Alcantara testified that he did not know Abdul-Halim. Dkt. No. 55-1 at 91-92. Alcantara admitted that he sent the letter to David London on January 30th and testified that he did not tell anyone that Abdul-Halim mailed the letter.[7] *Id.*

After Alcantara testified, Abdul-Halim reiterated his request for a copy of "any" mail watch authorization that was in place for his mail or Alcantara's mail at the time the London letter was intercepted. Dkt. No. 55-1 at 96. Bruyere stated, "[y]ou were told to do a FOIL request" and stated that the information was "not available." *Id*. Abdul-Halim also expressed various objections to the hearing. Specifically, Abdul-Halim objected to Woodworth's confidential testimony outside of his presence "for no reason" and argued that Bruyere could not rely upon confidential investigation, information, and statements, "without investigating it

---

[7] The transcript of Alcantara's testimony contains a notation indicating that the recording was paused or "turned off" with the following question open:

Abdul-Halim: All right, um. Did he, did he ever indicate to anybody that I mailed this letter out?
Bruyere: Did you ever indicate to anybody that inmate Abdul-Halim mailed (tape stops)
    (tape begins again on the other side)
And it is June 16th, 2017. Next question please.

Dkt. No. 55-1 at 92. Plaintiff claims that Alcantara responded "no" to the question. Defendants do not dispute this assertion.

[himself]." *Id.* at 97-98.  Bruyere advised Abdul-Halim that the informant refused to be interviewed and was not willing to testify.  Dkt. No. 55-1 at 98-100.

At the conclusion of the hearing, Abdul-Halim was found guilty of all charges listed in the MBR.  Dkt. No. 55-1 at 100-101.  Bruyere sentenced Abdul-Halim to 270 days in the Special Housing Unit ("SHU") with a corresponding loss of recreation, packages, commissary, and telephone privileges.  *Id.* at 57.  Abdul-Halim also lost 200 days of visitation privileges.  *Id.* Abdul-Halim was advised that he had the right to file an appeal of the disposition through the DOCCS' Commissioner's office.  *Id*. at 101.

On June 26, 2017, Abdul-Halim filed a FOIL request seeking a copy of the "mail watch authorization from an incident dated 1/30/17 in Elmira C.F."  Dkt. No. 47-1 at 24. Specifically, Abdul-Halim sought a copy of "any authorization for this incident."  *Id*.  On July 13, 2017, Abdul-Halim received a response indicating that, "[t]he record you request does not exist[.]"  *Id*. at 25.

In July 2017, Abdul-Halim appealed the hearing disposition to "the Director of Special Housing Unit."  Dkt. No. 55-2 at pp. 2-3, ¶¶ 6-13.  On August 30, 2017, defendant Donald Venettozzi ("Venettozzi") modified the sentence.  *Id.* at p. 4, ¶15.  In a memorandum to the Superintendent at Southport Correctional Facility, Venettozzi advised that the hearing was modified because the nature of the offense did not warrant the penalty imposed.  *Id.* at ¶ 16.

In August 2017, Woodworth visited Abdul-Halim at Southport Correctional Facility.  Dkt. No. 43-4 at 66-67; Dkt. No. 47-1 at 29-30.  Abdul-Halim testified about the August 2017 visit during his deposition:

Q.  [. . .] Do you remember what the purpose of that visit was?

6

> A. [. . .] He said he was shocked that I got that much time. He said he was expecting me to get around sixty days. I said I'm shocked that I got that much time for something that I didn't do and that Juan Alcantara testified that he did it. Mr. Woodworth said he didn't know that. He didn't know that Alcantara testified saying that he did it, that Alcantara did it, and that - - then that's when he clarified that Alcantara was the confidential informant and that he was going to go visit him after his visit with me[.][8]

Dkt. No. 43-4 at 64.

On September 18, 2017, Abdul-Halim asked Commissioner Anthony Annucci to "annul" the disciplinary determination. Dkt. No. 55-2 at 20-21. On September 27, 2017, Venettozzi responded to Abdul-Halim's letter and advised, "I do not believe there are sufficient grounds to reconsider the previous decision on [the June 16, 2017] hearing." Dkt. No. 1-1 at 11.

Abdul-Halim filed an Article 78 action. Dkt. No. 47 at 7. In April 2018, as a result of that action, Venettozzi reversed and expunged the determination from Abdul-Halim's disciplinary history. Dkt. No. 55-2 at 47-48. In a memorandum to the Superintendent of Great Meadow Correctional Facility ("Venettozzi April 2018 Memorandum"), Venettozzi advised that the hearing disposition was reversed noting, "hearing officer indicated that the mail watch authorization 'does not exist'." *Id*. at 47.

### B. Procedural History

On June 20, 2019, the Court received the Complaint in the within action. Dkt. No. 1. Upon review of the Complaint, the Court directed defendants Bruyere and Venettozzi to respond to the Fourteenth Amendment due process claims. *See generally* Dkt. No. 6.

On October 25, 2019, Defendants filed an Answer to the Complaint. Dkt. No. 13. On July 20, 2020, Abdul-Halim was deposed. Dkt. No. 43-4 at 3-91. On November 23, 2020,

---

[8] Defendants and Woodworth do not dispute these assertions.

Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to Abdul-Halim's claims.  Dkt. No. 43.  On December 17, 2020, Abdul-Halim filed opposition to Defendants' motion.  Dkt. No. 47.  On January 12, 2021, Defendants filed a reply.  Dkt. No. 48.  On January 13, 2021, Defendants' counsel filed a letter motion requesting permission to amend the declarations submitted in support of the motion.  Dkt. No. 49.  On January 24, 2021, the Court granted the request.  Dkt. No. 52.  On February 4, 2021, Defendants filed amended declarations, with exhibits.  Dkt. No. 51.  The Court provided Abdul-Halim with an opportunity to address the new submissions and, on February 16, 2021, he filed a response.  Dkt. No. 56.  On March 1, 2021, with the Court's permission, Defendants submitted a reply addressing Abdul-Halim's response.  Dkt. No. 57.

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 317, 248 (1986).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or

denials of the facts submitted by the movant.  Fed. R. Civ. P. 56; *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact.  *Scott*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997).  Furthermore, where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude.  *See Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d

185, 191–92 (2d Cir. 2008).  Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.  Local Rules

At the time of Defendants' motion, Local Rule 7.1(a)(3) provided[9]:

> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue.  Each fact listed shall set forth a specific citation to the record where the fact is established.  The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.  It does not, however, include attorney's affidavits.  Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.
>
> The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment.  *See also* L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts.  The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises.  The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.  The non-movant's response may also set forth a short and concise statement of any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs, followed by a specific citation to the record where the fact is

---

[9]  Effective January 1, 2021, the rule number was changed to Local Rule 56.1.

established.

Defendants filed a Statement of Material Facts. Dkt. No. 43-3. Abdul-Halim responded and admits the facts contained in certain paragraphs of Defendants' Statement of Material Facts. Dkt. No. 47. However, Defendants argue that Abdul-Halim's response does not comply with this Court's Local Rules because he failed to cite to the record. Dkt. No. 48 at 5, n.1. In deference to Plaintiff's pro se status and his attempt to respond to Defendants' Statement of Material Facts, the Court has opted to review the entire summary judgment record. *See D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 109, n.2 (2d Cir. 2006) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local rules.") (quoting *Holtz v. Rockefeller & Co.*, Inc., 258 F.3d 62, 73 (2d Cir. 2001)).

## C. *In Camera* Review

In support of the motion for summary judgment, Defendants rely upon the following evidence: (1) the confidential portion of the hearing transcript; (2) OSI Case No. NIU/17/10170 (the relevant case file); and (3) the unredacted Venettozzi April 2018 Memorandum. These documents were not uploaded on the Court's Docket through CM/ECF and were not served upon Abdul-Halim. Defendants offer to provide the Court with a copy of the confidential transcript and OSI investigation, *in camera*, "upon request."[10] Dkt. No. 55-1 at 4, n.2; Dkt. No. 55-3 at 3, n.3; Dkt. No. 55-3 at 4, n.4.

"[O]ur adversarial legal system does not generally sanction ex parte determinations on the merits of a civil case." *Vining v. Runyon*, 99 F.3d 1056, 1057 (11th Cir. 1996) (citation omitted). On a motion for summary judgment, "*[i]n camera* consideration of evidence is not

---

[10] A copy of the unredacted Venettozzi April 2018 Memorandum was previously provided to the Court for an *in camera* review on June 24, 2020. Dkt. No. 55-2 at 3, n.2.

appropriate in the absence of special circumstances[.]" *Hansberry v. Father Flanagan's Boys' Home*, No. CV-03-3006, 2004 WL 3152393, at *4, n.9 (E.D.N.Y. Nov. 28, 2004) (citations omitted).  In similar cases involving pro se prisoners, courts in this district have generally declined to consider *in camera* evidence on a motion for summary judgment.  *See Benitez v. Locastro,* No. 9:04-CV-423 (NAM/RFT), Dkt. No. 129, Order (N.D.N.Y. May 8, 2009); *Smith v. Greene,* No. 9:06-CV-505 (GTS/GJD), 2009 WL 10722414, at *2 (N.D.N.Y. June 8, 2009); *Gibson v. Rosati*, No. 9:13-CV-0503 (GLS/TWD), 2016 WL 11478234, at *2 (N.D.N.Y. May 19, 2016), *report and recommendation adopted*, 2016 WL 5390344 (N.D.N.Y. Sept. 27, 2016).

Here, the incidents that form the foundation of the claims occurred in 2017.  Defendants did not file a formal application for *in camera* submission and have not presented "special circumstances" to justify accepting the documents in support of Defendants' dispositive motion.[11]  Accordingly, the Court declines to consider the evidence offered *in camera*.

### III.  DISCUSSION[12]

Defendants move for summary judgment arguing that: (1) the claims for monetary damages are barred by the Eleventh Amendment; (2) Venettozzi was not personally involved in any constitutional violations; and (3) the Fourteenth Amendment claims against Bruyere must be dismissed because the minimum requirements of due process were satisfied during the disciplinary hearing.  Defendants also argue that they are entitled to qualified immunity on

---

[11]  The Court notes that Plaintiff was provided with an opportunity to review a redacted copy of the OSI file.  *See* Dkt. No. 47 at 7.  Defendants have not provided a copy of the redacted version of the file in support of summary judgment.

[12]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to Plaintiff.

the Fourteenth Amendment claims.  *See generally* Dkt. No. 43-1.

## A.  Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  "New York State has not consented to suit in federal court."  *Abrahams v. Appellate Div. of Supreme Court*, 473 F.Supp.2d 550, 556 (S.D.N.Y. 2007) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d. Cir. 1977)).

Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979).  "[C]laims against a government employee in his official capacity are treated as a claim against the municipality," and, thus, cannot stand under the Eleventh Amendment.  *Hines v. City of Albany*, 542 F.Supp.2d 218, 227 (N.D.N.Y. 2008).

In response to Defendants' motion, Plaintiff withdraws his claims against Defendants in their official capacity.  Dkt. No. 47-1 at 4.  Accordingly, I recommend that Defendants' motion for summary judgment and dismissal of all claims for monetary damages against Defendants in their official capacities be granted.

## B.  Personal Involvement

Defendants move for summary judgment and dismissal of all claims against Venettozzi arguing that Venettozzi was not personally involved in the disciplinary hearing. *See* Dkt. No. 43-1 at 10-13.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

Recently, the Second Circuit concluded that "there is no special rule for supervisory liability" and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). To avoid summary judgment, a plaintiff must establish that the defendant violated the constitution by his or her "own conduct, not by reason of [her] supervision of others who committed the violation" and could not "rely on a separate test of liability specific to supervisors." *Id*.

Abdul-Halim argues that Venettozzi was personally involved in the constitutional violations because he was responsible for the "final decision" on his appeal. Dkt. No. 47-1 at 5-6. While the record establishes that Venettozzi received and responded to Abdul-Halim's

14

appeal and letters, Abdul-Halim concedes that Venettozzi was not involved in the disciplinary hearing.  Dkt. No. 55-1 at 60-61.  Accordingly, Venettozzi's decisions related to Abdul-Halim's appeal do not constitute "individual actions" that violated the Constitution.  *See Brown v. Annucci*, No. 19 CV 9048, 2021 WL 860189, at *9 (S.D.N.Y. Mar. 8, 2021) (citation omitted) (dismissing due process claim against Venettozzi based upon allegation that Venettozzi denied the plaintiff's appeal because the plaintiff "plead[] no facts suggesting Venettozzi was personally involved in any procedural due process violation"); *see also Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) (citation omitted) (reasoning that, "even before *Tangreti*, affirming the outcome of a prison hearing was not sufficient to establish personal involvement"); *Clark v. Gardner*, No. 9:17-CV-0366 (DNH/TWD), 2021 WL 1200328, at *23 (N.D.N.Y. Mar. 8, 2021), *report and recommendation adopted sub nom*., 2021 WL 1198199 (N.D.N.Y. Mar. 30, 2021) (awarding Venetozzi summary judgment and dismissing the plaintiff's Fourteenth Amendment claims based upon *Tangreti*).

The undersigned recommends that the due process claims against Venettozzi be dismissed and summary judgment be granted in favor of Venettozzi.

### C.  Fourteenth Amendment Due Process Claims

To establish a procedural due process claim pursuant to 42 U.S.C. § 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process.  *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91

F.3d 349, 351-52 (2d Cir. 1996).[13]

Although inmates retain their constitutional right to due process protections, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the fully panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).

> Certain due process protections therefore apply where disciplinary proceedings may lead to the loss of good time credit or would subject an inmate to solitary confinement in the SHU. Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken.

*Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citations omitted).  To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must also garner the support of at least "some evidence."  *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.  Even assuming that an inmate was not afforded sufficient procedural due process, in order to establish a constitutional violation, the inmate must demonstrate that he was prejudiced by the alleged procedural errors or that the errors affected the outcome of the hearing.  *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir.1991); *see also Colantuono v. Hockeborn*, 801 F.Supp.2d 110, 115 (W.D.N.Y. 2011) ("Plaintiff must show that the outcome of the hearing likely would have been different had [the witnesses] been called.") (*citing inter alia, Clark v. Dannheim*, 590 F.Supp.2d 426, 429 (W.D.N.Y. 2008) (dismissing state prisoner's due process claim based on the hearing

---

[13]  Defendants do not seek dismissal of Plaintiff's due process claims on first ground.  *See generally* Dkt. No. 43.  As a result, the Court will not address that issue.  Instead, Defendants' argument is focused on whether Plaintiff was deprived of a liberty interest without being afforded sufficient process.  *See id.*

officer's denial of plaintiff's requests to review certain medical records, and to call DOCS sergeant as a witness, where plaintiff failed to demonstrate that he was prejudiced as a result))).

Abdul-Halim argues his procedural due process rights were violated because: (1) he was not provided with adequate notice of the charges against him; (2) his assistance was inadequate; (3) Bruyere was not fair and impartial; (4) he was denied the opportunity to present evidence; and (5) Bruyere's decision is not supported by "some evidence."[14]  *See* Dkt. No. 47-1 at 7- 11.

## 1.  Written Notice

An inmate must be provided with advance written notice of the charges against him so that he is able "to marshal the facts and prepare a defense." *Wolff*, 418 U.S. at 563-64.  The Second Circuit has "held that notice is constitutionally adequate when it is sufficiently 'specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.' " *Elder v. McCarthy*, 967 F.3d 113, 128 (2d Cir. 2020) (citation omitted).

Abdul-Halim objects to the MBR because it was written on a form generated at Watertown C.F and further claims that "he never lived" at Watertown C.F.  Dkt. No. 55-1 at 78-79; Dkt. No. 43-4 at 36.  Abdul-Halim also alleges that the MBR lacks a "specific date of incident" and that the lengthy gap between the incident and the filing of the report prevented him from adequately preparing his defense.  Dkt. No. 47-1 at 7; Dkt. No. 55-2 at 8.  Abdul-

---

[14]  The undisputed evidence establishes that Abdul-Halim received a written statement of the evidence relied upon and reasons for the disciplinary action.  Dkt. No. 55-1 at 59-61.

Halim's arguments lack merit.  The MBR is dated May 30, 2017.  Dkt. No. 55-1 at 16.

According to the record, Abdul-Halim was incarcerated in cell OI-01-22B at Watertown C.F.

from May 26, 2017 until May 30, 2017.  Dkt. No. 43-4 at 94.  The MBR includes: a date and

time of the incident; a list of the rules Plaintiff was charged with violating; and a description of

the incident.  Dkt. No. 55-1 at 16.  The Court has reviewed the report and finds that it

contains adequate information related to "the particulars of the alleged incident of

misbehavior involved."  *See* 7 N.Y.C.R.R. § 251-3.1(c)(1).

During the hearing, Abdul-Halim was able to articulate his objections to the charges, set

forth his demands for documentary documents with explanations related to the relevance of

the documents, and formulate questions for the witnesses.  The hearing transcript, which is

part of the record herein, demonstrates that Abdul-Halim understood the charges against him

and was able to present a defense.  *See Elder*, 967 F.3d at 128-29.

Accordingly, Abdul-Halim was provided with sufficient advance notice of the formal

charges.

## 2. Hearing Assistant

"Prison authorities have a constitutional obligation to provide assistance to an inmate in

marshaling evidence and presenting a defense when he is faced with disciplinary charges."

*Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988).  The right to assistance however, is

limited.  *Neree v. O'Hara*, No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y.

July 20, 2011) (citation omitted).  An assistant need only perform what the plaintiff would

have done but need not go beyond the inmate's instructions.  *Lewis v. Johnson*, No.

08–CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5, 2010) (citing *Silva v.*

*Casey*, 992 F.2d 20, 22 (2d Cir. 1993)).

Here, it is undisputed that Abdul-Halim received assistance from Foster.  Dkt. No. 55-1 at

64-65, 77.  Foster prepared an "Assistant Form" with an accompanying Memorandum,

detailing Abdul-Halim's requests for witnesses and documents and Foster's response to

these requests.  *Id*.  Construing the arguments liberally, Abdul-Halim claims that his

assistance was inadequate because he was not provided with "several articles" that he

requested including rules for writing misbehavior reports, a copy of confidential investigation

protocols, and a "chain of custody."  Dkt. No. 43-4 at 29; Dkt. No. 55-1 at 79-80.  Even

assuming that Foster failed to provide the aforementioned documents, no reasonable

factfinder could conclude that Abdul-Halim suffered any prejudice as a result.  As discussed

*supra*, Abdul-Halim was able to present a defense, pose questions to witnesses, and evinced

an understanding of the charges.  For example, Abdul-Halim asked Woodworth whether he

knew the date that the subject letter was mailed, why it took so long to issue the ticket, and

whether London ever visited or contacted Abdul-Halim after the letter was mailed.  Dkt. No.

55-1 at 83-86.  This demonstrates that Abdul-Halim had an understanding of the charges

against him.  Therefore, any shortcomings in the assistance rendered was harmless error

and does not rise to the level of a due process violation.  *Hernandez v. Selsky*, 572

F.Supp.2d 446, 455 (S.D.N.Y. 2008) (concluding that the plaintiff failed to show how outcome

of hearing would have been different had employee assistant interviewed witnesses, and

thus any alleged inadequate assistance was harmless error not warranting denial of

summary judgment).

### 3.  Fair and Impartial Hearing Officer

Prisoners have a constitutional right to a fair and impartial hearing officer. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges . . . [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . ." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna*, 356 F.3d at 487–88; *see Hill*, 472 U.S. at 455.

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen*, 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify*, 968 F.Supp.2d 532, 541 (W.D.N.Y. 2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez*, No. 09–CV–626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989)).

Abdul-Halim describes Bruyere as "bias and harsh," *see* Dkt. No. 43-4 at 49, however, the Tier III hearing transcript demonstrates that Bruyere explained to Abdul-Halim his rights and the hearing officer's obligations, read a copy of the misbehavior report into the record, and gave Abdul-Halim ample time to respond to the allegations in the misbehavior report and pose questions to the witnesses.

Even though Bruyere's determination was modified, there is no clear evidence that Bruyere was not a fair and impartial hearing officer.

### 4.  Failure to Provide Evidence

An accused prisoner has the right to a hearing where he is given the reasonable opportunity to call witnesses and present documentary evidence.  *Sira*, 380 F.3d at 69 (citing, *inter alia, Wolff*, 418 U.S. at 563–67).  In this regard, Abdul-Halim does not allege, and the record does not support, that he was denied the right to call and question witnesses during the hearing.  Rather, Abdul-Halim claims that his due process rights were violated because Bruyere failed to provide the mail watch authorizations and refused to allow Abdul-Halim to review Woodworth's investigative material.

### a.  Mail Watch Authorizations

During the hearing, Abdul-Halim requested copies of mail authorizations on two separate occasions.  Initially, Abdul-Halim asked Bruyere to request "a copy of any mail watch authorizations [. . .] yeah, yes mail watch authorizations for, [ ], me [. . .] or Mr. Alcantara" from Woodworth.  Dkt. No. 55-1 at 82.  The transcript does not contain a response from Bruyere or Woodworth to that request.  Then, on the last day of the hearing, Abdul-Halim reiterated his request for the mail watch authorizations:

> Abdul-Halim: Um, I asked for a copy of any mail watch or, or, or any authorization that was permitted to allow to go into this letter.
>
> Bruyere: You were told to do a FOIL request.
>
> Abdul-Halim: No, I was not.  I asked you.  And you . . .
>
> Bruyere: No, you asked the assistant, the tier assistant for it.

> Abdul-Halim: And I can ask for it at the hearing, supposed to be at the hearing as well.
>
> Bruyere: You can do a FOIL request for that.
>
> Abdul-Halim: So, it's not available?
>
> Bruyere: Not at this time.  You've been, your . . . it's not available.

Dkt. No. 55-1 at 96.

In July 2017, Abdul-Halim filed a FOIL request and asked for "a copy of the Mail Watch Authorization from an incident dated 1/30/17 in Elmira C.F." and specified that he was seeking "a copy of <u>any</u> authorization for this incident."  Dkt. No. 47-1 at 24.  Abdul-Halim was advised that the "mail watch authorization" did not exist.  *Id*. at 25.  In his appeals to Venettozzi and Annucci, Abdul-Halim cited to the lack of mail watch authorizations as justification for reducing his sentence.

After commencing the within action, Abdul-Halim continued to attempt to obtain the mail watch authorizations.  Dkt. No. 47-1 at 35.  In May 2020, Abdul-Halim filed a motion to compel seeking, *inter alia*, a copy of the mail watch authorization form "relevent [sic] for the record during the hearing."  Dkt. No. 31 at 4.  Abdul-Halim claimed that "Woodworth told plaintiff durring [sic] their visit in Southport C.F., that there [sic] allegedly was a mail watch."  *Id*.  Defendants responded to the motion stating:

> The specific mail watch authorization Plaintiff sought in his February RFP was not clear.  As now described in the instant motion, it appears that Plaintiff is seeking the mail watch authorization that would have been in place prior to him receiving the misbehavior report that led to the Superintendent's Hearing at the center of his remaining claim in this lawsuit.

Dkt. No. 32 at 4.  Relying upon Venettozzi's April 18, 2018 Memorandum, defense counsel

averred that "such mail watch authorization does not exist."  *Id.*

On June 24, 2020, the Court held a telephone conference to resolve the motion to compel.  Dkt. No. 36.  During the conference, defense counsel cited to Venettozzi's April 18 Memorandum and explained that, to the extent that Plaintiff "is looking for the one that was relied upon in the hearing, no such authorization exists; there wasn't one."  Audio tape: Conference on Plaintiff's Motion to Compel, held by the Court (June 24, 2020).

Four months later, Defendants filed the within motion for summary judgment with supporting declarations from Bruyere and Venettozzi.  Dkt. Nos. 43-5 and 43-6.  Bruyere averred that "no mail watch predating the London letter as to Plaintiff's mail could be found."  Dkt. No. 43-5 at p. 13, ¶54.  Similarly, Venettozzi asserted that "[i]n reviewing DOCCS records as a result of the instant lawsuit, it has become clear that there was no authorized mail watch in place for Abdul-Halim's mail when the London letter was intercepted from Mr. Alcantara's mail, because it was Mr. Alcantara's mail that was being watched - not Plaintiff's."  Dkt. No. 43-6 at p. 4, ¶15 (emphasis omitted).  With the original memorandum of law, Defendants maintained that no mail authorization existed for Plaintiff's mail and argued that the London letter was intercepted from Alcantara's mail.  Dkt. No. 43-1 at 8, 18; Dkt. No. 57 at 1.  After Abdul-Halim responded to the motion and Defendants replied, the matter was considered fully briefed.

Based upon the aforementioned history, the issue of whether a mail watch existed at the time of the incident seemed to be settled.  However, as discussed *supra*, while this motion was pending review, defense counsel sought this Court's permission to submit amended declarations explaining that, "I recently learned that the declarations [. . .] contain incorrect information."  Dkt. No. 51.  The Court directed Defendants to "identify the proposed

insertions and deletions of language either through the submission of a redline/strikeout version or through equivalent means." Dkt. No. 51. Having done so, the Court allowed Defendants to submit the amended declarations. The Court has compared the original declarations with the redline/strikeout versions and new declarations and finds that the amendments altered the declarant's statements only with regards to the mail watch authorizations, and in no other substantive way. To wit, in a declaration dated January 28, 2021, Bruyere stated, "I have been informed by counsel that, despite the FOIL response Plaintiff received, there *were* authorized mail watches in place for both Mr. Alcantara's mail and Plaintiff's mail at the time the London letter was intercepted at Elmira." Dkt. No. 55-1 at p. 13, ¶ 54. Similarly, Venettozzi stated that he was also "informed by counsel" that mail watches were in place for Alcantara and Plaintiff. Dkt. No. 55-2 at p. 4, ¶ 15. With Venettozzi's declaration, Defendants provide "[t]rue and correct copies of the pre-investigation authorized mail watches" as exhibits. *Id.* The "pre-investigation authorized mail watches" are dated January 17, 2017 and January 18, 2017 and authorized a sixty-day mail watch of all incoming and outgoing mail for Alcantara and Abdul-Halim.

At no time prior to filing the amended declarations did Defendants advise the Court or Abdul-Halim that any mail watch authorizations existed. For three and a half years, Defendants maintained that mail watch authorizations did not exist. While the Court does not suggest that Defendants or the Attorney General's Office intentionally misled Abdul-Halim, what is troubling is Defendants failure to search for or provide information that was not difficult to discover or confidential in nature. What is equally concerning to the Court is the fact that Defendants have not provided any explanation for the recent disclosure of these documents, which were clearly in existence at the time of the disciplinary hearing, the FOIL

request, and the telephone conference in June 2020.  The Court is not persuaded by

Defendants argument that the demand for authorizations was "vague" or "overbroad."  Dkt.

No. 32 at 3.  During the hearing and in his FOIL request, Abdul-Halim clearly asked for

copies of <u>any</u> authorizations pertaining to the incident.  Dkt. No. 47-1 at 24; Dkt. No. 55-1 at

82, 96.

Despite the continually evolving facts regarding the mail watch authorizations,

Defendants maintain that Bruyere's failure to provide the authorizations at the disciplinary

hearing was not a due process violation.  Dkt. No. 57 at 2.  After disclosing the mail watch

authorizations, Defendants' argument shifted.  Now, Defendants claim that while there was

an authorized mail watch for Abdul-Halim's mail, that fact is irrelevant to the due process

analysis because "the mail watch had nothing to do with the evidence relied upon to find

Plaintiff guilty of the charges at the conclusion of this disciplinary hearing."  Dkt. No. 57 at 1-

2.

Initially, the Court is not persuaded by Defendants' argument that the mail watch

authorizations are "irrelevant" to the issues before the Court.  Clearly, Defendants considered

the information significant and compelling enough to seek the Court's permission to amend

the summary judgment motion <u>after</u> it was fully briefed and pending the Court's review.

Furthermore, Defendants' contention that the mail watch "had nothing to do with the

evidence relied upon to find Plaintiff guilty" is wholly contradicted by the record.  The

redacted copy of Venettozzi's April 2018 Memorandum, submitted by Defendants in support

of summary judgment, provides:

> The above-noted Superintendent's hearing has been reversed
> on April 18, 2018, for the following reason(s):

25

[redacted] hearing officer indicated that the mail watch authorization "does not exist".

Dkt. No. 55-2 at 47.  Moreover, during the June 2020 conference, defense counsel assured the Court, that the only reason for the reversal of the Superintendent's hearing was the fact that the mail watch authorization did not exist.[15]  *See* Audio tape: Conference on Plaintiff's Motion to Compel, held by the Court (June 24, 2020).  With these facts before the Court, it is difficult to understand how Defendants can now argue that no issue of fact exists as to whether the omission of the mail watch authorizations affected the outcome of the hearing.  *See Jay v. Venetozzi*, No. 15-CV-147S, 2020 WL 4382001, at *7 (W.D.N.Y. July 30, 2020) (citation omitted) (holding that if an officer excludes evidence, "it is harmless error if the documents would not have led to a different result.").  Given the aforementioned summary and prolonged procedural history related to the mail watch authorizations, there are genuine issues of material fact for a jury to resolve related to whether Abdul-Halim was afforded sufficient process in this regard and whether Bruyere adhered to procedural safeguards.[16]

### b. Investigative Material

"While the Second Circuit has 'held that, at a minimum, a prisoner is entitled to be confronted with the accusation, informed of the evidence against him . . . and afforded a reasonable opportunity to explain his actions,' this right can give way to legitimate concerns over institutional safety."  *Boose v. Schneider*, No. 9:14-CV-0518 (MAD/DEP), 2016 WL 8732644, at *6 (N.D.N.Y. Feb. 19, 2016) (quoting *Francis v. Coughlin*, 891 F.2d 43, 47-48

---

[15]  Plaintiff claims that Juan Alcantara's testimony was the "second reason" for the reversal.  Dkt. No. 47 at 7.

[16]  The Court is constrained to rule in this manner because, to conclude otherwise would be a windfall for an interested party that provided false information and failed to adhere to the continued obligation during the course of the litigation to correct or supplement discovery.

(2d Cir. 1989) (quotation marks omitted)), *report and recommendation adopted*, 2016 WL 1175224 (N.D.N.Y. Mar. 24, 2016).  However, "[s]imply invoking security concerns, with no articulation at all of how institutional security could be jeopardized or compromised by turning over the evidence in question, does not meet [the] minimum constitutional standard." *Loret v. Selsky*, 595 F.Supp.2d 231, 234 (W.D.N.Y. 2009) (citations omitted).  Even if safety concerns prevent a confidential informant from testifying at a disciplinary hearing, an inmate may be entitled to information related to the "substance of the confidential information." *See Dawkins v. Gonyea*, 646 F.Supp.2d 594, 612 (S.D.N.Y. 2009).

The record establishes that Abdul-Halim was not provided with a copy of the confidential investigative report, or an opportunity to review the confidential materials, including the informant's statement.  It is undisputed that Bruyere adjourned the hearing to take confidential testimony from Woodworth.  Before he adjourned the hearing to elicit confidential testimony, Bruyere asked Abdul-Halim if "there is anything you would like me to ask the OSI investigator to help you prepare your defense?"  Abdul-Halim responded, "[ ] I would like to know, is there [. . .] If I could have a copy of the confidential informant statement, even if it's redacted." Dkt. No. 55-1 at 83.  Bruyere responded, "I doubt it, highly." *Id*.  The transcript lacks any further response to this request or an explanation for why the information would not be disclosed.

Prior to the conclusion of the hearing, Abdul-Halim again inquired about the investigative material:

> Abdul Halim: [. . .] is there a confidential statement in front of you?
>
> Bruyere: Is there what?

Abdul Halim: A confidential informant statement in front of you?
In that evidence that you have?

Bruyere: Yes, there is.

Abdul Halim: There is?

Bruyere: Uh-huh.

Abdul Halim: And you read it?

Bruyere: Uh-huh.

Dkt. No. 55-1 at 97.

Abdul-Halim also asked if the confidential informant's statement "is with [Bruyere's]

evidence?  It will be with the packet that goes to Albany and goes to the courts and

everything," Bruyere responded, "Nope."[17]  Dkt. No. 55-1 at 100.  Bruyere offered no further

information or explanation regarding the investigatory material.

In his declaration in support of summary judgment, Bruyere cites to DOCCS' Directive

4932 and "safety and security" as support for eliciting testimony outside of the inmate's

presence.  Dkt. No. 55-1 at p. 6, ¶¶ 27-28.  Bruyere also explains that "Plaintiff was not

permitted to have or review a copy of the confidential informant statement," because "[t]o do

so would impair the security of DOCCS' facilities[.]"  Dkt. No. 55-1 at 9, ¶ 36.  Abdul-Halim

disputes these facts and claims that Bruyere did not provide a reason for taking testimony

outside of his presence or for failing to provide the investigative materials.  Having conducted

---

[17] On summary judgment, Bruyere argues that the transcript contains a typographical error and, in fact, the confidential informant's statement was included with the hearing packet. Dkt. No. 55-1 at 10, n.5. The Court notes that the transcript was submitted by Defendants in support of summary judgment and is certified. Dkt. No. 55-1 at 75.  The record does not include an affidavit from the stenographer who recorded the transcript and, in light of Plaintiff's allegations, the Court cannot accept Bruyere's attempts to amend his response. *But cf. Mueller v. J.P. Morgan Chase & Co.*, No. 1:05-CV-560, 2007 WL 915160, at *2 (N.D. Ohio Mar. 23, 2007) (accepting inconsistencies that are "honest mistakes" and not factual contradictions).

an exhaustive review of the hearing transcript, the Court agrees with Abdul-Halim.  The

hearing transcript lacks any reference to DOCCS' Directive 4932 or any justification or

explanation for taking Woodworth's testimony outside of Abdul-Halim's presence.  *See id.* at

81.  Similarly, the transcript lacks any reference or mention of security concerns or DOCCS'

regulations in the context of disclosing the investigative material.  Furthermore, Bruyere did

not provide Abdul-Halim with an opportunity to review a redacted copy of the confidential

report, a non-confidential summary of the report, or an opportunity to obtain the documents

through alternate channels including, but not limited to, a FOIL request.  *But cf. Hameed v.*

*Mann*, 849 F.Supp. 169, 175 (N.D.N.Y. 1994) (dismissing the plaintiff's claim that he was

denied access to investigatory reports where the hearing officer advised the plaintiff to

contact the Superintendent of the facility to pursue the document request and offered to

adjourn the hearing); *but cf. Fullwood v. Vosper*, No. 9:99-CV-1586 (LES), 2007 WL 119456,

at *6 (N.D.N.Y. Jan. 9, 2007) (finding that the plaintiff received adequate process where he

obtained the investigation report via FOIL).

As stated *supra*, the confidential report is not before the Court for review.  Accordingly,

the Court cannot conclude, as a matter of law, that Bruyere's decision to deny Abdul-Halim

access to the investigative material did not deprive him of due process.  *See Loret*, 595

F.Supp.2d at 234 (stating that a request "jeopardizes institutional goals and safety," without

more, is insufficient); *but cf. Boose*, 2016 WL 8732644, at *6 (finding that the hearing officer

adequately explained that the redacted portions of the unusual incident report contained

confidential medical information that could expose the identity of the confidential informants).

Bruyere's unsupported explanations and justifications, that are contradicted by Abdul-

Halim, prevent this Court from finding that summary judgment is warranted.  *See Scotto v. Almenas*, 143 F.3d 105, 115 (2d Cir. 1998) (reasoning that summary judgment was improper where the plaintiff's assertions, unsupported by evidence, were specifically contradicted by the defendants in their affidavits).  Issues of fact exist as to whether Bruyere's refusal to disclose the investigative material at the hearing deprived Abdul-Halim of meaningful due process. *See Samuels v. Selsky*, 166 Fed. App'x 552, 555 (2d Cir. 2006) (vacating summary judgment "because no reasonable justification for the nondisclosure was proffered in the district court").

### 5.  "Some Evidence" Supporting Disposition

As discussed *supra*, where a prisoner claims he was denied due process in a prison disciplinary hearing because he was found guilty based on insufficient evidence, the claim must be rejected if there was "some evidence" to support the decision.  *Hill*, 472 U.S. at 455. In determining whether "some evidence" supports the disciplinary determination, courts have looked to "reliable evidence."  *See Luna*, 356 F.3d at 488.  "In the case of a prison disciplinary sanction based solely on the evidence supplied by a confidential informant, [courts] have said that this 'some evidence' standard requires 'some examination of indicia relevant to [the informant's] credibility.' " *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004) (citations omitted).  To that end, a hearing officer must conduct "an independent assessment of informant credibility."  *Sira*, 380 F.3d at 78; *see McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *13 (N.D.N.Y. Oct. 29, 2014) (citation omitted) ("noting that, when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure

fairness to the accused inmate is heightened") (internal quotation marks omitted).

"[T]he hearing officer is not required to personally interview or question the confidential informant, and may rely solely on the informant's hearsay statements." *Sowell v. Weed*, No. 07-CV-6355, 2013 WL 3324049, at *12 (W.D.N.Y. July 1, 2013) (citation omitted); *Peralta v. Vasquez*, No. 01 CIV. 3171, 2010 WL 391839, at *5 (S.D.N.Y. Feb. 4, 2010) ("[a] hearing officer may base a determination of guilt on a hearsay account of confidential informants' statements so long as he makes some independent assessment of the informants' credibility."), *aff'd sub nom. Peralta v. Goord*, 402 Fed. App'x 594 (2d Cir. 2010). A proper inquiry into credibility involves an evaluation of the "identity and reputation of the original declarant, his motive for making the statements at issue, whether he is willing to testify and, if not the reasons informing that decision, and the consequences he faces if his disclosures are proven false." *Dawkins*, 646 F.Supp.2d at 611 (citations omitted).

The hearing disposition includes the following summary of evidence relied upon: "Investigator Woodworth's testimony that through his investigation and his credible reliable confidential information, the letter asking D. London to smuggle in drugs to Elmira C.F. belonged to you." Dkt. No. 55-1 at 61. Bruyere claims that he personally reviewed the confidential report, including the confidential informant's statement, and found the informant to be credible. *Id*. at p.8, ¶ 33, p. 98.

In this case, although Bruyere was not "required to personally interview or question" the confidential informant, he was charged with the duty to "independently assess the credibility" of the confidential informant through Woodworth's testimony at the hearing. *See Mohamed v. Phelix*, No. 9:14-CV-01389 (TJM/TWD), 2017 WL 4326660, at *14 (N.D.N.Y. June 13,

2017), *report and recommendation adopted*, 2017 WL 4326520 (N.D.N.Y. Sept. 28, 2017).  It

is undisputed that Woodworth did not have first hand knowledge of the incidents in the MBR.

Consequently, because Woodworth's testimony was based upon hearsay, Bruyere was

charged with the duty to conduct "a greater inquiry into the reliability" of the information.  *See*

*Dawkins*, 646 F.Supp.2d at 611.  To that end, Bruyere posed questions to Woodworth

outside of Abdul-Halim's presence.  Dkt. No. 55-1 at 81, 83.  Upon resuming the hearing in

Abdul-Halim's presence, Bruyere asked Woodworth two questions:

> Bruyere: [. . . ] I'm going to let you recap how you came about
> the information and, uh, how you concluded that it belonged
> to inmate Abdulhalim.
>
> Woodworth: Okay.  I received, um, a letter from Elmira
> Correctional indicating that an inmate was attempting to solicit
> drugs into Elmira via the visit program.  The, an investigation
> was then conducted and it was determined that inmate
> Abdulhalim had solicited, um, visitor David London for
> contraband.  Um, confidential information was also, um used
> in determining the identity of the sender.
>
> Bruyere:   Okay.  And you're very confident that the
> confidential informant's information was accurate and that it,
> the informant could be used and trusted?
>
> Woodworth: Yes.

Dkt. No. 55-1 at 84-85.

Bruyere did not pose any further questions to Woodworth.  Because the confidential

portion of the hearing transcript is not part of the record before the Court, the inquiry with

respect to the reliability of the confidential information is limited to two questions.  There is no

evidence suggesting that Bruyere asked Woodworth how he received the confidential

information, whether the informant had "first hand knowledge" of the letter or Abdul-Halim's

conduct, whether Woodworth had prior experience with the confidential informant, or whether

there was any relationship between the informant and Abdul-Halim.  Consequently, the Court cannot conclude, as a matter of law, that Bruyere sufficiently and independently assessed the credibility and reliability of the confidential informant.  *See Dawkins*, 646 F.Supp.2d at 610-11 (holding that the hearing officer should have evaluated factors including the "identity and reputation of the original declarant, his motive for making the statements at issue, whether he is willing to testify and, if not the reasons informing that decision, and the consequences he faces if his disclosures are proven false"); *cf. McDonald v. Zerniak*, No. 9:15-CV-141, 2016 WL 6581289, at *6 (N.D.N.Y. Nov. 4, 2016) (reasoning that the hearing officer made sufficient "basic inquiries" regarding the reliability and credibility of the informant with inquiries regarding the Sergeant's prior dealings with the informant, the informant's "prior dealings" with the plaintiff, and tools utilized to secure the informant's positive identification).

Abdul-Halim argues that Woodworth's testimony was the only evidence that Bruyere relied upon and claims that the disposition lacks any other "supporting, corroborating, or circumstantial evidence."  Dkt. No. 47 at 5.  In support of summary judgment, Bruyere offers another explanation for his disposition; that he did not find Alcantara to be credible.  Dkt. No. 43-1 at 22; Dkt. No. 55-1. at p. 11, ¶ 43.  However, the written disposition does not include any reference to Alcantara or his testimony, including his admission that he wrote the London letter.

Even assuming Bruyere referenced Alcantara's lack of credibility as "some evidence" to support his decision, Abdul-Halim's claims regarding the identity of the informant prevent this Court from resolving the issue of whether that is "reliable" evidence.  As discussed *supra*, Bruyere did not interview the confidential informant and advised Abdul-Halim that the informant "refused to testify."  Dkt. No. 55-1 at 98, 100.  However, Abdul-Halim argues that

33

this statement is disingenuous because, at the time Alcantara was called to testify, Bruyere was "well aware" that Alcantara was the confidential informant who supplied information to Woodworth.  Dkt. No. 47-1 at 10, 11.  Thus, the confidential informant was before the hearing officer and willing to be questioned and, despite being aware of that fact, Bruyere failed to pose any questions to Alcantara.  *Id*.; Dkt. No. 43-4 at 56; Dkt. No. 55-1 at 100. Moreover,  Abdul-Halim argues that because Alcantara was the confidential informant, Bruyere could not concurrently conclude that the confidential informant was credible and that Alcantara was unreliable.  Dkt. No. 47-1 at 10, 11.

It is worth noting that this argument is not new.  Abdul-Halim first presented this claim in the Complaint, which was filed in June 2019.  Compl. at ¶ 17.  Abdul-Halim also testified about the identity of the confidential informant during his deposition in July 2020.  Dkt. No. 43-4 at 63-64.  Despite being aware of Abdul-Halim's contentions and having several opportunities to address it, Defendants and Woodworth do not dispute this claim. Woodworth does not confirm or deny that he met with Abdul-Halim and does not refute Abdul-Halim's sworn testimony regarding the sum and substance of their conversations.  *See generally* Dkt. No. 55-3.  Similarly, Bruyere admits that Woodworth disclosed the informant's identity to him during the confidential portion of the hearing, but Bruyere does not confirm or deny Abdul-Halim's assertions.  Dkt. No. 55-1 at p. 7, ¶ 30.  Moreover, Defendants' memorandum of law in support of the motion, memorandum of law in reply to Abdul-Halim's opposition, and sur-reply lack any rebuttal to this argument.

Based upon unresolved issues related to the reliability of the confidential information, this Court finds that there are genuine issues of fact concerning whether some evidence

supported Bruyere's decision. [18]

Based upon the totality of circumstances, there are material issues of fact as to whether Bruyere's actions and the disciplinary hearing comported with the constitutional due process protections that must be afforded to an inmate's disciplinary proceedings. Accordingly, it is recommended that Defendants' motion for summary and dismissal of Abdul-Halim's due process claims against Bruyere be denied.

### D. Qualified Immunity

In the alternative, Defendants argue that they are shielded from Fourteenth Amendment liability based on the doctrine of qualified immunity.[19] Dkt. No. 43-1 at 25-28.

Qualified immunity shields federal and state officials from suit " 'unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.' " *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A right is 'clearly established' if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Beckles v. City of New York*, 492 Fed. App'x 181, 182 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

---

[18] In a final attempt to establish that "some evidence" supported the disposition, Bruyere alleges that Alcantara provided "false statements" because, "Plaintiff and Mr. Alcantara were from different racial groups within the facility and if Mr. Alcantara had testified about Plaintiff, he likely would have faced serious retaliatory consequences." Dkt. No. 55-1 at 11, ¶ 43. The Court will not entertain this argument as the opinion is conclusory and not supported by competent, admissible evidence.

[19] To the extent that Defendants move for summary judgment and dismissal of all claims based on the doctrine of qualified immunity, I do not consider these arguments in the context of claims for which I have already recommend dismissal in this Report-Recommendation. *See Armand v. Simonson*, 12-CV-7709, 2016 WL 1257972, at *15 (S.D.N.Y. Mar. 30, 2016) ("[b]ecause the Court dismisses Plaintiff's claim against Peterson, there is no need to consider whether she may also be entitled to qualified immunity."); *see also Posr v. City of New York*, 10-CV-2551, 2013 WL 2419142, at *10, n.8 (S.D.N.Y. June 4, 2013) ("Because [the defendant] did not violate [the] [p]laintiff's [constitutional] rights, there is no need to consider if [the defendant] is entitled to qualified immunity."), *aff'd sub nom. Posr v. Ueberbacher*, 569 Fed. App'x 32 (2d Cir. 2014).

To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: " '(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful.' " *Phillips v. Wright*, 553 Fed. App'x 16, 17 (2d Cir. 2014) (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013)). "Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Doe v. Lima*, 270 F.Supp.3d 684, 710 (S.D.N.Y. 2017) (citations omitted), *aff'd sub nom. Doe v. Cappiello*, 758 Fed. App'x 181 (2d Cir. 2019).

Here, the record contains genuine issues of material fact as to the Fourteenth Amendment due process claims against Bruyere. As such, the first prong of the qualified immunity analysis has been met.

With respect to the second prong, "there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony[.]" *McAllister,* 2014 WL 5475293, at *18 (citations omitted). Here, in support of the motion for summary judgment, Defendants summarize the legal standards related to qualified immunity and state, in a cursory manner, that Bruyere reasonably believed he was acting in accordance with established law. Dkt. No. 43-1 at 26.

Because the Court is not presented with clear evidence that qualified immunity applies,

the Court recommends denying Defendants' motion for summary judgment and dismissal based upon qualified immunity.

## IV.  CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment and dismissal (Dkt. No. 43) be **GRANTED** as to:

a.  Plaintiff's claims for monetary damages against Defendants in their official capacities; and

b.  Plaintiff's Fourteenth Amendment claims against Venettozzi; and it is further

**RECOMMENDED**, that Defendants' motion (Dkt. No. 43) be **DENIED** as to:

a.  Plaintiff's Fourteenth Amendment claims against Bruyere; and

b.  the issue of qualified immunity; and it is further

**ORDERED** that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules; and it is further

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[20] days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court**. __FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW__**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

---

[20]  If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(c).

U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.


DATED: May 10, 2021


Miroslav Lovric
U.S. Magistrate Judge